IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN MARIANA ISLANDS

JANE DOE, ET AL,            )
                            )
            Plaintiffs,     )
                            )
        vs.                 )   Civil Case No. 09-23
                            )
BENIGNO R. FITIAL, ET AL,   )
                            )   Garapan, Saipan
            Defendants.     )

- - - - -

MOTION TO DISMISS

- - - - -

BEFORE THE HONORABLE ALEX R. MUNSON, Chief Judge,
on January 14, 2010

- - - - -

FOR THE PLAINTIFFS:
  Bruce Jorgensen, Esq.
  (Via telephone)

FOR DEFENDANT CNMI:
  Elchinon Golob, Esq.

FOR DEFENDANT NMI RETIREMENT FUND:
  James E. Hollman, Esq.

FOR DEFENDANT BOARD OF TRUSTEES:
  Viola Alepuyo, Esq.
  Deborah Fisher, Esq.

- - - - -

Transcribed by:
  Patricia A. Garshak
  Official Court Reporter

- - -

1          (The following was transcribed from an audio tape
2      recording by Patricia A. Garshak, Official Court
3      Reporter:)

                         - - -

                Thursday, January 14, 2010

                         - - -

8          THE CLERK:  If Your Honor please, this is Civil
9      Case 09-0023, Jane Doe, et al, versus Benigno R.
10     Fitial, et al, coming up for a hearing on a Motion to
11     Dismiss.
12          Will counsel please state your appearance.
13          MR. JORGENSEN:  Good morning, Your Honor.  This is
14     Bruce Jorgensen, representing plaintiffs.
15          THE COURT:  Good morning.
16          MR. GOLOB:  Elchinon Golob, representing the
17     Commonwealth.
18          MR. HOLLMAN:  James E. Hollman, representing
19     Northern Marianas Island Retirement Fund.
20          MS. ALEPUYO:  Viola Alepuyo and Deborah Fisher,
21     representing the Board of Trustees.
22          THE COURT:  Thank you.
23          The Clerk advises me that Mr. Lord could not be
24     reached.  The number that he gave us is only a
25     recording, so we'll proceed without him.

1    MR. GOLOB:  Very well, Your Honor.

2    THE COURT:  I read all of the briefs and

3    everything that has been filed.  I have a bunch of

4    questions for all parties.

5    First of all, for the Northern Marianas Islands

6    Retirement Fund Executive Director or the CNMI --

7    that's you, Mr. Golob; right?

8    MR. GOLOB:  Well, I'm the CNMI.  I'm not the

9    Retirement Fund or the Director.

10   MR. HOLLMAN:  Your Honor, I'm the Retirement Fund

11   and the administrator.

12   THE COURT:  All right.  First of all, how much

13   money is owed to the fund today, approximately?

14   MR. HOLLMAN:  I think it's approximately

15   $281 million, Your Honor.

16   THE COURT:  What was the judgment, 230?

17   MS. FISHER:  Your Honor, if I may, originally, it

18   was 230, and then there was a subsequent hearing, at

19   which Miss Alepuyo presented testimony, and the Judge

20   actually modified the judgment.  I believe we attached

21   a copy of that to one of our documents that we

22   submitted.

23   THE COURT:  Do you agree it's around 281?

24   MS. FISHER:  Yes, Your Honor.

25   THE COURT:  Are there ongoing negotiations?

1    MS. FISHER:  Your Honor, if I could have

2    Miss Viola Alepuyo address that, she's been

3    participating.

4         THE COURT:  Thank you.

5         MS. ALEPUYO:  It's called a negotiation, because

6    that's what the original judgment had said from the

7    Court.  The Court had encouraged the parties to get

8    together to figure out a way in which to make payments.

9         Since then, yes, the talks have been occurring.

10   There has been a plan that has been presented from the

11   Central Government in which to figure out a way to pay

12   the judgment and ensure the financial viability of the

13   fund all the way up until the last member has been

14   paid.

15        There's currently a counteroffer -- not a

16   counteroffer, but an alternate plan that the Retirement

17   Fund is working on in order to present to the Central

18   Government.  We are not quite in the phase yet to

19   present it to them, because we need to go through the

20   Board, as well as the members, before we can bring it

21   over to the Central Government.

22        THE COURT:  How many sessions of negotiations have

23   there been?

24        MS. ALEPUYO:  One -- two formal ones, Your Honor,

25   between the two parties.  There have been talks, like,

1    prior to hearings.

2        THE COURT:  When you say the two parties, are you

3    talking about the plaintiffs in this case?

4        MS. ALEPUYO:  Not the plaintiffs in this case,

5    Your Honor, but the plaintiffs in the local action

6    court, yes.

7        THE COURT:  Tell me again, how close are the

8    parties to agreeing on a viable plan to pay off the

9    judgment?

10       MS. ALEPUYO:  I would say, Your Honor, that we're

11   more than halfway.  With regards to payment of the

12   plan, that's one of the -- or payment on the judgment,

13   that's one of the issues that's being addressed.

14       However, the bigger issue is to ensure that the

15   Retirement Fund is financially sound, so that the last

16   member can be paid.

17       The judgment itself is being paid pursuant --

18   in addition, on November 2, those payments were

19   increased as an offer from the Central Government,

20   and they have been paid to date.  The payments are

21   current.

22       THE COURT:  They are current in the full amount?

23       MS. ALEPUYO:  Yes, Your Honor.

24       THE COURT:  And there's been an offer in these

25   negotiations of $150 million or $140 million?

1  MS. ALEPUYO:  Actually, what the --

2  THE COURT:  You know what?  We don't have a court

3  reporter here.  Maybe you better come up to the lectern

4  so that we get a good record.

5  (Pause in the proceedings.)

6  MR. HOLLMAN:  Your Honor, I have some information

7  that might be useful --

8  THE COURT:  Hang on.  You're going to get your

9  chance at the questions.

10  MR. HOLLMAN:  Thank you, Your Honor.

11  MS. ALEPUYO:  With regards to the large amount

12  that's being contemplated to be paid over to the

13  Retirement Fund from the Central Government, there has

14  been steps taken to have a pension obligation bond

15  issued.

16  Now, it doesn't go forward in the 16th

17  Legislature, because there was, like, four different

18  versions.  However, there is a draft currently that

19  the administration is going to sponsor to the

20  Legislature, and we're trying to figure out if we can

21  get that on the ballot this year, because we are going

22  to have an election.  But we don't know if it's a

23  special election or a general election and whether

24  we're allowed to have an initiative, because you can't

25  have initiatives on a special election, Your Honor.

You can only have initiatives on a ballot through a general election.

THE COURT:  Doesn't the Legislature have the authority to approve issuance of bonds?

MS. ALEPUYO:  Yes, Your Honor, but before the Legislature can approve the issuance of that bond, the CNMI Constitution must be amended in order to allow for that, because it is a public debt.

THE COURT:  And so -- well, as a side issue, what is the CNMI's bond rating, Triple A, Double A, A, B?

MS. ALEPUYO:  Your Honor, if I could respectfully defer to Mr. Aguon on that, he's the expert on that with regards to the Retirement Fund.

THE COURT:  Thank you.

(Pause in the proceedings.)

MS. ALEPUYO:  According to Mr. Aguon, Your Honor, a B or B-A -- is that correct?  The best he can remember.

THE COURT:  B?

MS. ALEPUYO:  B.

THE COURT:  Well, even if that was successful and there were $140 million approved, what about the other $140 million?

MS. ALEPUYO:  The bond that is actually being contemplated, Your Honor, does not have a monetary

figure on it. The reason why is because we wanted to be sure that we're allowed to get a pension obligation bond by amending the Constitution and then making a determination how much exactly it is that's needed.

The one initiative that was before the 16th Legislature that had a monetary figure was actually $200 million, and then there was three other initiatives without a dollar figure, Your Honor.

THE COURT: And you say that that will take a year?

MS. ALEPUYO: We're hoping -- the election is in November, so yes, Your Honor.

THE COURT: So by that time, what's it anticipated the debt is going to be? Over 300 million?

MS. ALEPUYO: More than likely, Your Honor, yes. Yes, Your Honor.

THE COURT: Has the fund made public to its beneficiaries a full accounting of the present status of the bond?

MS. ALEPUYO: Yes, Your Honor. There is -- at the end of every fiscal year, there is an external audit that is conducted at the Retirement Fund. That is made public. That is presented during a Board meeting, where the meeting is announced to the public, and there

1    are actually members who attend.

2         In addition, every year, there's what's called a

3    Money Manager's meeting here at the Retirement Fund,

4    where all the money managers, including the investment

5    consultant, flies to Saipan, and they apprise the Board

6    of the fund's investment condition.

7         After the Money Manager's meeting with the Board,

8    Your Honor, there is also a presentation at the

9    Legislature.  So the legislative body, as well as the

10   executive, they're invited so the report can be

11   presented to them.

12        In addition, there is always scheduled a meeting

13   at the Multipurpose Center, where it's announced to the

14   public, and members of the Retirement Fund, both

15   retirees and current Government employees, can come and

16   hear that report.

17        So yes, the answer to that question, Your Honor,

18   is yes.

19        THE COURT:  Just so I'm perfectly clear, it's your

20   best estimate that the fund can fully be paid off

21   within a year?

22        MS. ALEPUYO:  No, no, Your Honor.

23        THE COURT:  What is that time line?

24        MS. ALEPUYO:  With regards to the complete payment

25   of the judgment, Your Honor --

1          If I may have a moment, please.

2          (Pause in the proceedings.)

3          MS. ALEPUYO:  Your Honor, I've been advised that

4     that process with regards to the pension obligation

5     bond is about 18 months to two years, as opposed to one

6     year.

7          THE COURT:  So it's going to be 350 million by

8     then?

9          MS. ALEPUYO:  Potentially, yes, Your Honor.

10         THE COURT:  How long is it anticipated that the

11    present corpus can be viable to pay off all the

12    retirees?

13         MS. ALEPUYO:  If I may have a moment, Your Honor.

14         (Pause in the proceedings.)

15         MR. HOLLMAN:  Your Honor, if I may, we're doing

16    our best to answer that question.  Mr. Aguon --

17         THE COURT:  Announce your appearance, because on

18    the tape-recording, it's not going to show.

19         MR. HOLLMAN:  James Hollman on behalf of the fund.

20         If I may, it's not that easy, but Mr. Aguon is

21    giving our best estimate, because we do have a

22    five-point plan we're trying to go forward with the

23    Legislature, and it entails a certain -- sum certain be

24    given every year which, in turn, would alter the figure

25    and the estimated --

1  THE COURT: I understand. Are you talking about
2  three years, five years?
3  MS. ALEPUYO: No, Your Honor. The Administrator
4  advises it's more like eight to nine years presently
5  with what we have in investments in the stock market,
6  as well as local investments.
7  THE COURT: And if nothing is done in nine years,
8  the fund would be completely broke?
9  MS. ALEPUYO: More or less, Your Honor, yes.
10  And Your Honor, I would just like to say that
11  during the hearings, we actually had the Retirement
12  Fund actuary testify in this very court through video
13  teleconference, and his expert -- in his expert
14  opinion, he could not come out and say whether the fund
15  was -- at what point could the fund be fully funded, at
16  what point could the -- how many years it would take
17  for the fund to actually be, for lack of a better word,
18  "broke", Your Honor.
19  He said that there was a multitude of different
20  factors, but that one of the things that he has advised
21  is that there needs to be an amendment to the laws in
22  order -- because Public Law 6-17 that sets up the
23  Retirement Fund, the way in which employer
24  contributions and employee contributions is supposed to
25  be coming in is different now that the fund is a closed

1    plan, as opposed to when all the members -- all the new

2    Government employees that were coming in were D-B

3    members, as opposed to the D-C plan or D-C members.

4    Because of the inception of the D-C plan, it's now a

5    different -- the situation is different.

6        THE COURT:  Did the judgment in the Superior Court

7    include investment growth?

8        MS. ALEPUYO:  No, Your Honor, it did not.  It was

9    a draft -- there was an investment aspect of the

10   judgment that was addressed by the Judge.  However, the

11   judgment itself contemplated payment -- I apologize.

12   Did you mean that did it include the lost opportunity

13   that was lost because --

14       THE COURT:  Yes.  I mean --

15       MS. ALEPUYO:  Yes.  That was phase two of the

16   trial, Your Honor.

17       THE COURT:  What was the percentage that was

18   assigned to the judgment for growth?

19       MS. ALEPUYO:  It varied on the different years

20   since the Retirement Fund had started investing, so it

21   depended on how much either the Retirement Fund earned

22   or lost in the stock market, and --

23       THE COURT:  So what did that come out to be,

24   5 percent, 6 percent?

25       MS. ALEPUYO:  On an average, you mean, Your Honor?

1        THE COURT:  Yes.

2        MS. ALEPUYO:  The market was, like, fluctuating

3    in, like, 2001, 2002; that was really bad years.  The

4    rollercoaster ride was on a downturn, the Dot Com

5    crash, Your Honor.  That was in the negatives.

6        There was some years we were up 5 percent, we were

7    up 9 percent.

8        THE COURT:  Did the Court assign any percentage

9    for loss of growth on the money that is owed to the

10   fund?

11       MS. ALEPUYO:  Not as a whole, but on a

12   year-by-year basis --

13       THE COURT:  I understand.

14       MS. ALEPUYO:  Yes, it did.

15       THE COURT:  What was the range of the percentage

16   that the Court assigned to go from zero -- did it go

17   from zero to ten, or something else?

18       MS. ALEPUYO:  We actually presented a graph, a

19   spread sheet, Your Honor, of all the different years,

20   how much money was remitted, how much money was not

21   remitted, and then how we did with the money that was

22   remitted.

23       I don't have that graph with me, Your Honor, but

24   we could submit it to the Court.

25       THE COURT:  What's your best estimate?

         1          MS. ALEPUYO:  If I could have a moment, please.

         2          (Pause in the proceedings.)

         3          MS. ALEPUYO:  For a three-and-a-half year, Your

         4     Honor --

         5          It was five years -- I'm sorry.  At five years, it

         6     was three-and-a-half percent, and at ten years, it was

         7     four-and-a-half percent.

         8          THE COURT:  All right.  Thank you.

         9          Mr. Jorgensen, you wanted to be heard on one

        10     issue?

        11          MR. JORGENSEN:  Your Honor, you mentioned the

        12     timetable -- again, it's Bruce Jorgensen speaking.  You

        13     mentioned the timetable as to the ongoing negotiations,

        14     and I attached as an Exhibit P-22 to a reply that was

        15     supposed to have been electronically filed -- I'm not

        16     sure whether that succeeded or not.

        17          But in that news article, which was dated

        18     January 6, the Chairman of the fund is quoted as

        19     indicating that the Board plans to start negotiations

        20     by the end of the month, meaning by the end of January.

        21     So that would give you, I think, the time frame we're

        22     looking for in that regard.

        23          I have other comments as to some of these other

        24     matters that were raised.  I don't know if you'd like

        25     to hear those now, or if you would like me to wait.

THE COURT:  Let me ask you, why haven't you sought to intervene in the Superior Court as an interested party to urge the fund to begin collection proceedings on its judgment?

MR. JORGENSEN:  Your Honor, the primary reason is that my clients and myself feel more comfortable in the Federal forum, because we feel that there's both an institutional conflict and a bevy of personal conflicts related to the CNMI judiciary, which is unfortunate, but I think that's what the circumstance is.

We also feel that the Federal Court has broader latitude regarding prospective remedies.

THE COURT:  Well, but you already have a judgment in the Superior Court.  The Superior Court is certainly capable of enforcing its Orders.

MR. JORGENSEN:  We feel that the Federal Court has much broader capabilities in that regard, Your Honor. The CNMI judiciary, while on paper it certainly has the ability, I think the CNMI's fiscal condition concerns the CNMI judiciary, as much as it does other CNMI institutions.

THE COURT:  Well, I mean, you can't go to one court and win, and then if you're not satisfied, go to another court on a matter that's been fully adjudicated, can you?

1    MR. JORGENSEN:  We feel that the Federal Court has

2    full jurisdictional capabilities to enforce the

3    judgment of the Superior Court, Your Honor.

4    THE COURT:  What about abstention?  Should this

5    Court abstain?  There's a concept of comity.

6    MR. JORGENSEN:  Yes, I understand the concept,

7    Your Honor.  We don't feel it would be appropriate in

8    this case because of the inherent conflicts facing the

9    CNMI judiciary.

10    THE COURT:  Well, the CNMI judiciary is the one

11    that issued the judgment in the amount of 230 million

12    bucks.

13    MR. JORGENSEN:  Yes, Your Honor.  That was a

14    default judgment.  From my standpoint, it involved two

15    entities of the CNMI that we feel might not be dealing

16    at arm's length because of the political nature of --

17    THE COURT:  Well, what do you got to lose by

18    petitioning the Court to intervene to have them enforce

19    that judgment?

20    MR. JORGENSEN:  Well, the plaintiffs might be

21    willing to do that on their own, Your Honor.  I'm not

22    admitted in the CNMI Superior Court.

23    THE COURT:  Well, you could be admitted pro hac

24    vice.

25    MR. JORGENSEN:  Your Honor, they require a

1    5,000-dollar application fee for pro hac vice, and my

2    clients are in no position to reimburse that kind of

3    funding.

4        THE COURT:  Well, that can be waived, and you can

5    either -- and even defer payment until after the

6    judgment is satisfied.  I understand what you're

7    saying, that you think all of these deficiencies, but

8    you haven't exhausted them yet, have you?

9        MR. JORGENSEN:  No, Your Honor, I've not proceeded

10   in the CNMI Superior Court.  If the matter goes to the

11   Superior Court, I will not be involved in it at that

12   level.

13       THE COURT:  Say that again.  What?

14       MR. JORGENSEN:  If your Court should abstain or

15   invoke the doctrine of comity, I would not be able to

16   represent my clients.  I would not feel comfortable

17   appearing before the CNMI judiciary for a variety of

18   reasons.

19       THE COURT:  Let me ask you, why should the

20   plaintiffs be allowed to proceed as "Doe" plaintiffs?

21       MR. JORGENSEN:  Because unlike some litigants who

22   have been before your Court previously, Your Honor, who

23   are young nonresident workers or middle-aged people, my

24   clients are very elderly, so they're very, very

25   susceptible to any interference with --

1    THE COURT:  Aren't they in the States?

2    MR. JORGENSEN:  Yes, they are.  However, they do

3    maintain strong contacts with the CNMI, and of course,

4    it is the CNMI itself which is supposed to be providing

5    their benefits, and indeed, they have significant

6    difficulties communicating.

7    You mentioned earlier whether things have been

8    publicly communicated, and from the CNMI standpoint,

9    perhaps they have public meetings and that kind of

10   thing, but the fund has had no operable Internet

11   website for the mainland situated people, so they have

12   to rely on friends in the CNMI, as well.

13   THE COURT:  Well, the affidavits that were in

14   support of their proceeding as "Doe's" were pretty

15   conclusionary.  It would seem that you should review

16   those affidavits and explicitly state why, other than

17   in conclusionary fashion, that they should be allowed

18   to proceed.

19   I know in the garment factory, plaintiffs were

20   "Doe" plaintiffs, and the Ninth Circuit said they were

21   allowed to because of the declarations that they filed

22   that were very specific of why they had a fear of

23   retaliation.  But just to say they're fearful of

24   retaliation, without some justification, I think is a

25   little thin.

         MR. JORGENSEN:  Very well, Your Honor.  I will
communicate with them and, based on those
communications, prepare some supplemental submissions
for your review.

         THE COURT:  Questions for the Board:  Does the
Board have a fiduciary duty to these people?

         MS. FISHER:  Your Honor, if I may; Deborah Fisher.

         THE COURT:  Could you come up to the lectern.

         MS. FISHER:  Your Honor, absolutely, we have a
fiduciary to our members, our beneficiaries.

         What we're arguing, really, is that any kind of a
claim that someone would want to bring of that nature
is really of a trustee relationship, which is a State
Court claim.

         So we actually had the beneficiaries intervene in
our State Court claim.  Mr. Edward Arriola did make a
motion to intervene, and so there's been a recognition
in State Court that the beneficiaries have an interest
of some kind, and we would argue that we are
prosecuting this in the way that we need to.

         We are upholding our fiduciary duties, and I don't
know if Your Honor wants me to go into it at this
point, but the distinction we're making here is just
that there's no Federal question jurisdiction.  There's
nothing of a Constitutional nature.

1          THE COURT:  You don't need to go into that right

2     now.  Let me ask these questions.

3          You have a judgment.  Why are you negotiating at

4     all?

5          MS. FISHER:  This is something put forward,

6     actually, by the State Court judge that's in the

7     judgment.  He, in some ways, even though this is a

8     huge, huge judgment, the Court -- it's almost as if

9     we're having Order in Aid of Judgment proceedings.  As

10    Your Honor knows, we actually have another status

11    hearing January 25th, during which we're going to

12    report to the Court.

13         The Court made it clear that the Court wanted us

14    to enter into some kind of a discussion and negotiation

15    for how to pay this, because -- I think Your Honor has

16    recognized, this is a big undertaking and needs to be

17    thought about.  There's a lot of angles on it in terms

18    of law making, as well as coming up with creative ways

19    to pay.  And Your Honor, as Miss Alepuyo has stated,

20    the Government has already started to pay us more.  We

21    have been getting certain tax revenues as we have --

22         THE COURT:  Did it start paying down --

23         MS. FISHER:  The employee contribution amount,

24    which we are owed.  The amount that's coming in now is

25    higher than it was.  We have actually --

1          THE COURT:  That was my question.  Is it

2     100 percent?  Is the Government paying 100 percent what

3     they're supposed to do, and in addition, working down

4     the arrearage?

5          MS. FISHER:  I understand, Your Honor.  We're not

6     quite up to that amount, and for more specific numbers,

7     again, Miss Alepuyo spent 11 days -- I know this was a

8     default judgment, but we actually were on trial for --

9     I believe it was 11 days, with expert testimony from

10    our actuary, with testimony from money managers, going

11    through all of the laws that led us to what

12    contributions had to be paid.

13         This was not given to us.  This was something that

14    we went through a lot of hours and hours and hours of

15    testimony on and had to prove.

16         THE COURT:  Okay.  I'm still not clear.  Is the

17    Government now making 100 percent of the contributions

18    that they are required to make?

19         MS. FISHER:  They are not, and I'd like, if I

20    could, to get a more exact number, just so you have an

21    idea.

22         THE COURT:  So then this keeps growing and

23    growing; correct?

24         MS. FISHER:  Well, you know, after going through

25    the actuary's testimony, I'm really reluctant to say

1   anything like that, because --

2       THE COURT:  You don't need to be an accountant.

3   If you're not paying 100 percent of what you're

4   supposed to, then the debt's growing.

5       MS. FISHER:  That's true, and that sounds right,

6   but when the actuary testified, he talked about the

7   solvency of the fund, and he was actually unwilling to

8   say, oh, the fund's not solvent, because he had so many

9   factors of how money's coming in and how these

10  investments make money or lose money.  We got mortality

11  tables.

12      It's incredibly complicated, and so we sort of

13  thought, well, this is going to be really easy to

14  prove.  We'll just put the actuary up, and he'll say

15  this one's not solvent.  They're not paying.  And

16  that's not what happened.  It wasn't that

17  straightforward.  He didn't go that far as to say this

18  is not solvent now, and --

19      THE COURT:  I'm not talking about solvency.  I'm

20  talking about increasing the debt.  I mean, if they're

21  not paying 100 percent of what they're supposed to be

22  paying, then they're accruing more debt, are they not?

23  I mean --

24      MS. FISHER:  We also have a situation now with a

25  closed plan where we have a set number of people, we

1      have certain people who are either leaving or who are

2      dying.  We have certain money coming in.  I think the

3      numbers change and shift, and I'd like to get -- you

4      know, if I could, Your Honor, I'm sorry --

5           THE COURT:  Maybe I'm not making myself clear.

6      But if you have a credit card and you have a

7      hundred-dollar debt on it, and you only pay ten of a

8      hundred dollars, you owe the 90 percent and interest on

9      that.

10          By the same token, if the Government's not paying

11     100 percent of what they're supposed to be paying in,

12     aren't they increasing the amount of their debt?

13          MS. FISHER:  If you don't mind, Your Honor, I

14     would really prefer if Miss Alepuyo could address it,

15     because I don't feel comfortable -- I'm not smart

16     enough with the financials.  She did all of the

17     financial testimony.

18          THE COURT:  All right.

19          MS. ALEPUYO:  Thank you, Your Honor.  I apologize.

20     With regard to -- when the Retirement Fund was first

21     set up, it was enacted by Public Law 6-17.  Six-17 had

22     a methodology whereby the actuary was supposed to look

23     at various factors and then make a recommendation to

24     the Board of Trustees, who is then supposed to adopt

25     that actuary-determined employee contribution rate.

1        And then that's the rate that's set for all employer

2        contributions.

3            However, like I said earlier, Your Honor, because

4        the D-C plan is now different than from its

5        inception -- I'm sorry, the D-B plan, because of the

6        creation of the D-C plan.

7            During the November 2 hearing, we actually

8        presented to the Court different scenarios, whereby the

9        Government actually paid 100 percent, which would be

10        the actuary-determined rate, even if they did that, it

11        still would not be enough to meet the demands of the

12        annual budget of the Retirement Fund, and that's why

13        we've been encouraging the Legislature to amend Public

14        Law 6-17 and come up with a different way in which to

15        ensure that the Retirement Fund is financially --

16            THE COURT:  I understand that.  My question is

17        real simple:  How much is the Government paying towards

18        their contribution; 100 percent or less?

19            MS. ALEPUYO:  If you're going to look at the last

20        public law that set the employer contribution rate,

21        it's at 11 percent.

22            THE COURT:  And is the Government paying

23        11 percent?

24            MS. ALEPUYO:  The Government is actually paying

25        20 percent, Your Honor.

1    THE COURT:  Okay.

2    MS. ALEPUYO:  On top of the 20 percent, they're

3  also paying taxes, which the Department of Finance

4  Secretary -- assistant -- Acting Secretary testified

5  during the November 2nd hearing averages -- will

6  average to about $140,000 a month additional on top of

7  the 20 percent.

8    THE COURT:  To decrease the judgment of 280,000 --

9    MS. ALEPUYO:  Million.  Yes, Your Honor.

10    THE COURT:  Okay.

11    (Pause in the proceedings.)

12    MS. FISHER:  Your Honor, if I may just very

13  briefly add, we just found from our administrator that

14  the fund website is now operable, and the financial

15  statements are all available there.  They are online.

16    THE COURT:  The fund, it is their position that

17  they are an arm of the State?

18    MR. HOLLMAN:  Your Honor, James Hollman on behalf

19  of the fund.

20    If you look at the Mitchell factors established by

21  the Ninth Circuit, we're clearly an arm of the State

22  due to the five-factor test, and we'll go into that if

23  the Court prefers, but underlyingly, it's -- basically,

24  it's the Commonwealth is underlying guarantor, so we're

25  an arm of the State, not unlike Commonwealth Ports

1    Authority in the Ninth Circuit case.

2         THE COURT:  Well, if you're an arm of the State,

3    how can you negotiate with the State?  Aren't you both

4    on the same side?

5         MR. HOLLMAN:  Not necessarily, Your Honor, because

6    intra government memorialization of debt is certainly

7    no novelty; Marianas Public Land Trust has, in the

8    past, with Marianas Public Land Corporation.  The

9    Commonwealth Development Authority has, in the past,

10   with the Commonwealth Utilities Corporation.

11        In effect, it's a memorialization of debt.  Having

12   obtained the judgment, now the money is coming in, and

13   that's basically how we look at it.

14        With regard to some form of being on the same

15   side, it's just not that simple, Your Honor, because

16   there's so many different elements of the Commonwealth

17   Government that do apply, which go back to our original

18   Federalism argument.  Like the New York cases in

19   Withers, where as long as somebody is getting paid,

20   they really don't have an injury in fact, and that's

21   where we go back to the part where, you know, it deals

22   with the executive function, legislative function and

23   judicial function, as we have sought.

24        And we're still in court doing a variety of

25   different matters too.  We're trying to cut costs.  I

1    think the cases cited was filed in this Court that's

2    been dismissed without prejudice; is now in the

3    Superior Court concerning a long-term cutting of costs

4    to a 3 percent bonus, which we have currently in front

5    of Judge Naraja.

6         There's so many different parts of the Government

7    that do apply here, Your Honor, and that's where we

8    come with, essentially, our jurisdiction argument.

9         THE COURT:  Have you moved the Court to satisfy

10   the judgment, to execute on property of the

11   Commonwealth that owes the money?  They certainly have

12   a quarter of a billion dollars in assets.

13        MS. ALEPUYO:  That is one of the items that we are

14   currently discussing.  So yes, we have -- we have not

15   moved the Court yet, but it is an item of discussion

16   between the parties.

17        THE COURT:  Well, you know, part of the definition

18   of a Court is the ability to enforce its judgments.  If

19   a Court can't enforce its judgments, it's not a Court.

20   And if you've got a full Final Order, then it's got to

21   be satisfied.  And in order for it to be satisfied,

22   you've got to move the Court to order that, and that

23   needs to be done.

24        MR. HOLLMAN:  Your Honor, if I may, on a brief

25   aside, I think part of the miscommunication that

1    occurred was the Court's footnote referred to

2    settlement negotiations.

3        Well, you don't negotiate a judgment.  We have a

4    judgment, and we just seek to enforce it, and that's

5    the post judgment procedure, and that's why Judge

6    Govendo has his mandamus authority, which we're still

7    in.  We're still undergoing that mandamus authority.

8        THE COURT:  Well, I ask the question again:  Have

9    you asked him to execute on the judgment, to enforce

10   his judgment?  I mean, what good's a judgment if nobody

11   pays any attention to it?

12       MS. ALEPUYO:  Your Honor, the Court -- when it

13   issued the 231 million and, subsequently, the 280 some

14   million judgment, say that -- and ordered several

15   payments to be made, one of which was the 16 percent

16   payroll contribution rate, which was at 11 percent, and

17   in addition, the taxes to be paid to the Retirement

18   Fund.

19       With regard to that portion of the Order, that has

20   been satisfied.  I mean, it continues to be satisfied

21   with the monthly payments, and in addition, the

22   Government had actually offered, and it was increased

23   to 20 percent from the 16 percent, Your Honor.

24       THE COURT:  And is it anticipated -- I read in the

25   newspaper -- that's not a legal cite, but somebody was

1    quoted as saying it would take ten to 20 years to get

2    back to where it's supposed to be.  Is that your

3    understanding?

4        MR. HOLLMAN:  Yes, Your Honor.  If I may, the

5    chairman -- that's Chairman Igisomar -- what he was

6    talking about was my understanding is the long-term

7    five-point plan, which the administrator is going to

8    present to the Legislature concerning a variety of

9    reforms, to include the legislation we drafted, the

10   pension obligation bond, a soft freeze on benefits and

11   a 457 plan, and some other things that we're working

12   on, and I think -- well, I understand we all read the

13   newspaper every day, Your Honor, but I really would

14   urge all courts in all jurisdictions, particularly this

15   jurisdiction, to be somewhat reticent as to what we

16   read in the paper on a daily basis.

17       THE COURT:  All right.  Thank you.

18       Mr. Jorgensen, do you have any evidence about

19   malfeasance versus misfeasance?

20       MR. JORGENSEN:  I'm sorry, Your Honor?

21       THE COURT:  Do you have any hard evidence of

22   malfeasance versus misfeasance?

23       MR. JORGENSEN:  No, Your Honor.  Your Honor, some

24   of what you were saying did strike a chord with regard

25   to the judgment itself, which took three years to get,

and the Government having not moved yet to satisfy the
judgment.  One of the adages I've always heard you
mention in court is "justice delayed is justice
denied".

What we're looking at here now is about four years
have already gone by, and nothing's transpired, and now
we're hearing about a five-point plan involving the
CNMI Legislature, which historically, has been
problematic; that is, any legislative involvement with
the CNMI Legislature has been problematic, and we don't
seem to see any security here.  That is, what's the
back-up if and when the legislation transpires, what's
to secure the debt if the legislation is amended or
modified, as was done with Immigration over the course
of 20 years?  It seems to me that -- I don't even
really understand why there's negotiations, when they
can go in and enforce this judgment, and --

THE COURT:  Well, that's an end in sight.

MR. JORGENSEN:  Yeah.  I mean, then you're working
from a position of strength, or at the very least,
you're an option on the properties, CUC, CPA, CHC.
There wouldn't be any need for negotiations.  I don't
understand why this is taking so long.

THE COURT:  Is Mr. Lord still involved in this
case?

1       MR. JORGENSEN:  Yes, he is.

2       THE COURT:  Why doesn't he intervene at the

3  Superior Court and attempt to enforce the judgment?

4       MR. JORGENSEN:  He's in the process of going

5  in-house with a private entity, Your Honor, which does

6  not involve the practice of law.  He made that decision

7  last Friday, I believe.

8       THE COURT:  That's why I just asked, is he still

9  involved with this case, and apparently, he is legally,

10  but he's going to be dropping out.  Is that what you're

11  telling me?

12       MR. JORGENSEN:  Yes.  He won't be playing an

13  active role, Your Honor.

14       THE COURT:  You mean he won't be counsel of record

15  anymore?

16       MR. JORGENSEN:  I anticipate that.  He has not

17  told me that himself, but that's what I anticipate.

18       THE COURT:  Well, then it occurs to me that either

19  you or somebody else should move to intervene to

20  enforce the judgment, rather than opening up another

21  lawsuit.

22       Okay.  Does anybody want to say anything else?

23  I've read everything that you've filed with the Court.

24  We don't need to go through that again.

25       MR. JORGENSEN:  I have nothing further, Your

Honor, although I'd like to wish you, everyone, best

wishes for a happy 2010.

THE COURT:  Thank you.

Anybody else want to say anything?

I'd like to wish everybody the same best wishes.

MS. FISHER:  Your Honor, same for us.  Best

wishes, and we trust that the Court has all the papers.

Thank you.

THE COURT:  The Court, obviously, is not ready to

rule from the bench on this.  The Court will take this

matter under advisement and apprise counsel of the

Court's ruling.

I got to tell you, if anybody hasn't gleaned from

the Court's questions and the answers, I think an

abstention at this time is probably going to be the

Order.  I mean, we've got a Court of record of

competent jurisdiction that has issued a judgment in

this matter, and if anybody thinks that that judgment

hasn't been paid or is not being paid, they need to

urge the Court, and in order to have standing to make

the argument to the Court, they're going to have to

move to intervene.  It seems pretty simple.

There being nothing further to come before the

Court, I'll wish everybody a Happy New Year too, and

we'll take up the next matter.

1   MR. JORGENSEN:  Thank you, Your Honor.

2   MS. FISHER:  Thank you, Your Honor.

3   MR. HOLLMAN:  Thank you.

4   (The proceedings were concluded.)

5       - - -

1           CERTIFICATE OF REPORTER

2

3           I, PATRICIA A. GARSHAK, Official Court

4    Reporter, in the United States District Court for the

5    Northern Mariana Islands, appointed pursuant to the

6    provisions of Title 28, United States Code, Section

7    753, do hereby certify that the foregoing is a true and

8    correct transcript of the proceedings held in the

9    within entitled and numbered cause on the date

10   hereinbefore set forth, and I further certify that the

11   foregoing transcript has been prepared from an audio

12   tape to the best of my ability.

13

14

15

16

17

18

19

20

21                        _____

22                        PATRICIA A. GARSHAK, RDR-CRR

23                        Official Court Reporter

24

25